[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 104 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 105 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 106 
Nathan Slaton appeals the circuit court's denial of his Rule 32, Ala.R.Crim.P., petition for postconviction relief, in which he attacked his capital-murder conviction and his sentence of death.
On April 11, 1990, Slaton was convicted of the murder of 68-year-old Modenia Phillips; the murder was made capital because it was committed during the course of a rape, see §13A-5-40(a)(3), Ala. Code 1975.[1] The jury unanimously recommended that Slaton be sentenced to death for his conviction. The trial court accepted the jury's recommendation and sentenced Slaton to death. Slaton's conviction and sentence were affirmed on direct appeal, see Slaton v. State, 680 So.2d 877
(Ala.Crim.App. 1993), on return to remand, 680 So.2d 879
(Ala.Crim.App. 1995), aff'd, 680 So.2d 909 (Ala. 1996), and the United States Supreme Court denied certiorari review, see Slatonv. Alabama, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680
(1997). A certificate of judgment was issued on July 30, 1996. InSlaton v. State, 680 So.2d 879 (Ala.Crim.App. 1995), this Court summarized the facts of the crime as follows:
 "[B]etween 8:30 a.m. and 9:00 a.m. on May 28, 1987, in Albertville, a neighbor saw 17-year-old Slaton in Mrs. Phillips's yard with a BB gun, shooting at birds. Mrs. Phillips was Slaton's next-door neighbor. A short while later, the neighbor saw Slaton standing by Mrs. Phillips's front door, then saw him go into the house. He came out about 30 minutes later, the neighbor testified. *Page 107 
 "A friend of Mrs. Phillips's drove up about five minutes after the neighbor saw Slaton leave. The friend testified that he tried the front door, found the door unlocked, and went inside. He said he saw Mrs. Phillips lying on the bathroom floor, and when he tried to use the telephone to call for help, saw that it had been unplugged. The friend then left the house to get Mrs. Phillips's daughter, who worked nearby. When the pair returned to the house and Mrs. Phillips's daughter saw her mother's body, she called police and paramedics. Mrs. Phillips was dead when police arrived.
 "The evidence showed that Mrs. Phillips had been raped, beaten about the head, strangled, and shot in the chest. Semen taken from the victim's vagina matched Slaton's blood type. Slaton was arrested the day after the murder. While being interrogated by police, he gave a statement in which he confessed to shooting Mrs. Phillips during a scuffle over a gun."
680 So.2d at 884-85.
Slaton, through counsel, filed his Rule 32 petition on January 29, 1998, raising 15 claims. The State filed a response to the petition and a motion to dismiss those claims in the petition that were subject to the procedural bars in Rule 32.2 and/or insufficiently pleaded pursuant to Rule 32.3 and Rule 32.6(b). The circuit court then dismissed several of the claims in Slaton's petition on the ground that they were barred by various provisions in Rule 32.2; it also dismissed several claims on the ground that they were insufficiently pleaded, but gave Slaton time to amend those claims to comply with Rule 32.3 and Rule 32.6(b). On August 11, 1998, December 16, 1999, and May 5, 2000, the circuit court conducted hearings on Slaton's petition. At the conclusion of the hearings, the circuit court permitted the parties time to file post-hearing briefs. On April 9, 2001, the circuit court issued a thorough 45-page written order denying Slaton's petition.
Initially, we note that "the plain error rule does not apply to Rule 32 proceedings, even if the case involves the death sentence." Cade v. State, 629 So.2d 38, 41 (Ala.Crim.App. 1993). In addition, "[i]t is well settled that `the procedural bars of Rule 32 apply with equal force to all cases, including those in which the death penalty has been imposed.'" Nicks v.State, 783 So.2d 895, 901 (Ala.Crim.App. 1999), quoting Statev. Tarver, 629 So.2d 14, 19 (Ala.Crim.App. 1993). When reviewing a circuit court's denial of a Rule 32 petition, this Court applies an abuse-of-discretion standard. See McGahee v. State,885 So.2d 191 (Ala.Crim.App. 2003). "`[I]f the circuit court is correct for any reason, even though it may not be the stated reason, we will not reverse its denial of the petition.'"Scroggins v. State, 827 So.2d 878, 880 (Ala.Crim.App. 2001), quoting Reed v. State, 748 So.2d 231, 233 (Ala.Crim.App. 1999).
 I.
Slaton contends that the circuit court erred in adopting the State's proposed order as its own. Specifically, he argues that by adopting the State's proposed order, the circuit court denied him "a full and fair hearing by a neutral factfinder." (Slaton's brief at p. 64.)
As the State correctly points out in its brief to this Court, this issue was never presented to the circuit court; therefore, it is not properly before this Court for review. See, e.g.,Whitehead v. State, 593 So.2d 126, 130 (Ala.Crim.App. 1991) (holding that claim that the circuit court's order was deficient because it did not include specific findings of fact regarding each issue *Page 108 
was not preserved for review where it was not raised in the circuit court).
However, even assuming that this issue is properly before this Court for review, it has no merit. "Alabama courts have consistently held that even when a trial court adopts verbatim a party's proposed order, the findings of fact and conclusions of law are those of the trial court and they may be reversed only if they are clearly erroneous." McGahee v. State, 885 So.2d 191,229-30 (Ala.Crim.App. 2003). See also Dobyne v. State,805 So.2d 733 (Ala.Crim.App. 2000), aff'd, 805 So.2d 763 (Ala. 2001);Jones v. State, 753 So.2d 1174 (Ala.Crim.App. 1999); Lawhornv. State, 756 So.2d 971 (Ala.Crim.App. 1999); and Grayson v.State, 675 So.2d 516 (Ala.Crim.App. 1995). The findings and conclusions in the circuit court's order, even if initially drafted by the State, present a fair and accurate statement and analysis of the evidence presented to the court. In addition, the judge who presided over the Rule 32 proceedings and issued the order denying Slaton's petition is the same judge who presided over Slaton's trial and, therefore, was thoroughly familiar with the case. After reviewing the record, we have no doubt that the circuit court's order denying Slaton's Rule 32 petition represents the circuit court's independent judgment and its considered conclusions and, as explained more fully below, we conclude that those findings and conclusions are supported by the evidence and are not clearly erroneous. We find no error on the part of the circuit court in adopting the State's proposed order as its own.
 II.
As the circuit court correctly noted in its order denying Slaton's petition, several of Slaton's claims are procedurally barred by various provisions of Rule 32.2. Although Slaton argues the merits of these claims in his brief on appeal, we need not address the merits because we conclude, as did the circuit court, that the claims are procedurally barred.
We find that the following claims are procedurally barred by Rule 32.2(a)(3) and (a)(5) because they could have been, but were not, raised and addressed at trial and on appeal:
 1. That death by electrocution constitutes cruel and unusual punishment.
 2. That the district attorney had a conflict of interest.[2]
 3. That the trial court erred in not instructing the jury on felony murder as a lesser-included offense to the offense of capital murder.
 4. That his death sentence is unconstitutional because it was imposed pursuant to a pattern of racial bias in the imposition of the death penalty in Alabama.
The following claims are procedurally barred by Rule 32.2(a)(3) and (a)(4) because they could have been, but were not, raised and addressed at trial, and they were raised and addressed on appeal:
 1. That the trial court erred in admitting testimony from a transcript of an unauthenticated tape recording of Slaton's statement to police. See Slaton v. State, 680 So.2d at 888; Ex parte Slaton, 680 So.2d at 915.
 2. That the trial court erred in not instructing the jury that it could reject Slaton's statement to police as involuntary. See Slaton v. State, *Page 109 680 So.2d at 887-88; Ex parte Slaton, 680 So.2d at 914.
 3. That the trial court erred in instructing the jury that only a portion of Slaton's statement to police had been admitted into evidence because some portions of the statement were inadmissible. See Slaton v. State, 680 So.2d at 885-86; Ex parte Slaton, 680 So.2d at 913.
 4. That Slaton's death sentence is disproportionate to the sentences imposed in other cases because he was 17 years old at the time of the crime. See Slaton v. State, 680 So.2d at 909; Ex parte Slaton, 680 So.2d at 928-29.
Additionally, Slaton's claim that the trial court erred in admitting into evidence his statement to police is procedurally barred by Rule 32.2(a)(2) and (a)(4) because it was raised and addressed both at trial and on appeal. See Slaton v. State,680 So.2d at 886-87; Ex parte Slaton, 680 So.2d at 913-14.
Because all of the above claims are procedurally barred by various provisions in Rule 32.2, the circuit court's denial of these claims was proper.
We also note that the following claims were raised in Slaton's petition and were addressed by the circuit court in its order, but are not pursued by Slaton on appeal:
 1. That the State withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
 2. That one of the prospective jurors on the venire did not answer questions truthfully during voir dire examination.
 3. That Alabama's death-penalty statute is unconstitutional.
 4. That the trial court erred in appointing counsel to represent Slaton at trial who did not have five years of criminal law experience.
Because Slaton does not argue these claims on appeal, they are deemed abandoned. "We will not review issues not listed and argued in brief." Brownlee v. State, 666 So.2d 91, 93
(Ala.Crim.App. 1995).
 III.
Slaton contends that his trial counsel, David Jackson Evans[3] and George M. Barnett, were ineffective during both the guilt and penalty phases of his trial.
Our review of this claim is governed by the following principles:
 "`In order to prevail on a claim of ineffective assistance of counsel, a defendant must meet the two-pronged test articulated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):
 "`"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown *Page 110 
in the adversary process that renders the result unreliable."
"`466 U.S. at 687, 104 S.Ct. at 2064.
 "`"The performance component outlined in Strickland
is an objective one: that is, whether counsel's assistance, judged under `prevailing professional norms,' was `reasonable considering all the circumstances.'" Daniels v. State, 650 So.2d 544, 552 (Ala.Cr.App. 1994), cert. denied, [514 U.S. 1024, 115 S.Ct. 1375, 131 L.Ed.2d 230 (1995)], quoting Strickland, 466 U.S. at 688, 104 S.Ct. at 2065. "A court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 690, 104 S.Ct. at 2066.
 "`The claimant alleging ineffective assistance of counsel has the burden of showing that counsel's assistance was ineffective. Ex parte Baldwin, 456 So.2d 129 (Ala. 1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985). "Once a petitioner has identified the specific acts or omissions that he alleges were not the result of reasonable professional judgment on counsel's part, the court must determine whether those acts or omissions fall `outside the wide range of professionally competent assistance.' [Strickland,] 466 U.S. at 690, 104 S.Ct. at 2066." Daniels, 650 So.2d at 552. When reviewing a claim of ineffective assistance of counsel, this court indulges a strong presumption that counsel's conduct was appropriate and reasonable. Hallford v. State, 629 So.2d 6
(Ala.Cr.App. 1992), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994); Luke v. State, 484 So.2d 531 (Ala.Cr.App. 1985). "This court must avoid using `hindsight' to evaluate the performance of counsel. We must evaluate all the circumstances surrounding the case at the time of counsel's actions before determining whether counsel rendered ineffective assistance." Hallford, 629 So.2d at 9. See also, e.g., Cartwright v. State, 645 So.2d 326
(Ala.Cr.App. 1994).
 "`"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.' There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."
 "`Strickland, 466 U.S. at 689, 104 S.Ct. at 2065
(citations omitted). See Ex parte Lawley, 512 So.2d 1370, 1372 (Ala. 1987).
 "`"Even if an attorney's performance is determined to be deficient, the petitioner is not entitled to relief unless he establishes that `there is a *Page 111 
reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Strickland,] 466 U.S. at 694, 104 S.Ct. at 2068."
"`Daniels, 650 So.2d at 552.
 "`"When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer — including an appellate court, to the extent it independently reweighs the evidence — would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."
 "`Strickland, 466 U.S. at 697, 104 S.Ct. at 2069, quoted in Thompson v. State, 615 So.2d 129, 132
(Ala.Cr.App. 1992), cert. denied, 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 418 (1993).
 "`In a Rule 32 proceeding, the petitioner has "the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief." Rule 32.3, Ala.R.Crim.P. See Fortenberry v. State, 659 So.2d 194 (Ala.Cr.App. 1994), cert. denied, 516 U.S. 846, 116 S.Ct. 137, 133 L.Ed.2d 84 (1995); Wilson v. State, 644 So.2d 1326
(Ala.Cr.App. 1994); Elliott v. State, 601 So.2d 1118 (Ala.Cr.App. 1992).'
 "Bui v. State, 717 So.2d 6, 12-13 (Ala.Cr.App. 1997), cert. denied, 717 So.2d 6 (Ala. 1998).
 "Moreover, `[a] finding of no plain error is one factor to consider when assessing the performance of counsel.' Fortenberry [v. State], 659 So.2d 194, 200 (Ala.Cr.App. 1994), cert. denied, 516 U.S. 846, 116 S.Ct. 137, 133 L.Ed.2d 84 (1995), quoting Hallford [v. State], 629 So.2d 6, 10 (Ala.Cr.App. 1992), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994). `"A finding of no manifest injustice under the `plain error' standard on a direct appeal serves to establish a finding of no prejudice under the test for ineffective assistance of counsel provided in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674
(1984)."' Williams v. State, 783 So.2d 108, 133
(Ala.Cr.App. 2000), quoting State v. Clark, 913 S.W.2d 399, 406 (Mo.Ct.App. 1996). See also Thomas v. State, 766 So.2d 860 (Ala.Crim.App. 1998)."
Dobyne v. State, 805 So.2d 733, 742-44 (Ala.Crim.App. 2000), aff'd, 805 So.2d 763 (Ala. 2001).
In addition, in its order denying Slaton's petition, the circuit court made the following findings regarding trial counsel's background, experience, and trial strategy:
 "Although he was actually represented by three attorneys at trial — George Barnett, David Evans, and Tameria Driskill — Slaton alleges only that George Barnett and David Evans rendered ineffective assistance of counsel. District Court Judge David Jackson Evans graduated from the University of Alabama School of Law in January of 1975 and was admitted to the Bar on May 16, 1975. He spent the first two years of his practice at Gullahorn, Hare 
Evans. There, he had a general practice involving some 15 percent criminal work and three percent felony criminal defense. In 1977, Evans opened his own office in Boaz and stayed there until he took the bench as a district court judge in 1991. Prior to this trial, Judge Evans had tried fifty cases, ten of them criminal, and had also served as city prosecutor for the cities of Boaz, Sardis, and Albertville. Based on the foregoing and *Page 112 
the court's personal knowledge of this attorney, the court notes that, at the time of this trial in 1990, Judge Evans was more than qualified to represent Nathan Slaton at trial. Judge Evans had been engaged in the active practice of law for almost fifteen years. Judge Evans had significant trial experience and enjoyed an excellent reputation in the community and among his peers as an accomplished member of the Bar.
 "George M. Barnett graduated from the University of Alabama School of Law in May of 1967 and was admitted to practice law in September of 1967. From September of 1967 until January of 1969, Mr. Barnett practiced in Guntersville with Ralph Smith and W.D. Wilkes. One third of his practice was criminal law. In January of 1969, he became the administrative assistant to Congressman Tom Bevill and continued in that capacity until June 1971. At this time, he entered a law practice with John Starnes which lasted until January of 1973. Mr. Barnett became Mayor of Guntersville at that time, but continued in the fulltime practice of law until 1976. From 1976 to 1980, he practiced law only part-time due to other business concerns. From 1980 until August of 1983, Mr. Barnett practiced law full-time with Ralph Smith. In August of 1983, Mr. Barnett opened a practice with Claude Hundley, with whom he is still a partner to this day. Prior to this case, Mr. Barnett had tried 200 jury trials. Thirty to forty of these trials were criminal, most involving felonies. During that time, he also handled five murder cases, two resulted in acquittals and two pleaded out. Mr. Barnett also served as city attorney for Guntersville from March 1981 through October of 1992. Based on the foregoing, the court notes that, at the time of this trial in 1990, Mr. Barnett had been licensed to practice law for over 23 years. During this time, he had engaged exclusively in the practice of law for some 17 years, including the eleven years immediately preceding Slaton's trial. Mr. Barnett had extensive trial experience and, according to the personal knowledge of the court, this attorney enjoyed an excellent reputation in the community and among his peers as one of the foremost attorneys in this area. See Chandler v. United States, 218 F.3d at 1313-1319 (holding that `[w]hen courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger.').
 "Evans and Barnett first met with Slaton immediately after being appointed to this case. Evans's interview lasted for `some hours.' He subsequently met with Slaton in excess of twenty times over the course of his representation. Barnett stated that he met with Slaton some 25 to 35 times and that the other two attorneys met with Slaton separately on other occasions. In total, there were upwards of 75 different contacts between Slaton and members of the defense team. During these meetings, Slaton was helpful in providing information, but refused to give them any information concerning the actual crime.
 "Defense counsel engaged in extensive investigation in preparation for trial. Raford Slaton, Nathan's father, was very cooperative in providing them with information and they also received material from Oliver Loewy, an attorney with the Capital Resource Center. Defense counsel walked the neighborhood where Mrs. Phillips lived, interviewed her neighbors, and went through her home inspecting the murder scene. Slaton's defense attorneys visited Mrs. Opal *Page 113 
Bryant's[4] home and checked out her story as to how she was able to see Slaton enter Mrs. Phillips's home and whether the times she reported were accurate. Defense counsel also reviewed the District Attorney's file and so were well aware of Slaton's statement and tried to have it suppressed. After defense counsel learned of a possible mental health defense, Barnett and Driskill traveled to New York to collect Slaton's mental health records and interview the various mental health experts that had treated him in the past. They also associated a local New York attorney to assist them in procuring the testimony of these mental health professionals.
 "Defense counsel's guilt phase strategy was primarily to keep Slaton's statement out of evidence and to convince the jury that Slaton suffered from a mental disease or defect. They used Slaton's evaluations from New York, and the accompanying testimony from the mental health experts, to support this defense and then used this same evidence during the penalty phase as mitigating evidence, along with testimony concerning Slaton's bad childhood, in order to evoke feelings of compassion in the jurors. Defense counsel chose not to put on an identity defense because, since Bryant had recognized Slaton as the one who entered the house and Slaton had given the statement explaining his involvement in the crime, they believed it to be too specious an argument to put before a jury. As Evans stated, `a lot of what you do with a jury has to do with your own credibility and putting someone up there that isn't going to fly and everybody in the room knows it's not going to fly, it tends to harm one's credibility that you may need later in the trial.' Moreover, defense counsel did not request any further testing, such as another EEG or DNA testing, because they did not want to do a test that would confirm that Slaton did not have a mental health problem or that he was definitely the murderer.
 "Evans correctly defined the penalty phase as `a time in which we would give the jury what evidence we had as to why they should not recommend death.' Defense counsel had begun thinking about sentencing from the very beginning and knew they were not limited to statutory mitigating factors, and could, therefore, use anything positive that they had, as long as it was ethical. Thus, they followed up on all the information that they received in an effort to prepare for the possibility of this phase. Slaton had refused to follow the advice of his trial counsel in that he had refused to testify on his own behalf, and while, from the very beginning, there were ongoing plea negotiations lasting until the jury came back with its sentence recommendation, Slaton refused to accept the life without parole offer. Because Slaton refused to testify, the best that they could do was to rely on the mental health testimony in addition to the testimony about his bad childhood."
(C. 404-08.) (Footnotes and citations to record omitted.)
With these findings and principles of law in mind, we turn to the specific grounds Slaton argues to support his claim that his trial counsel were ineffective.
 A.
Slaton, who was indigent, contends that Alabama's statutory scheme for compensating *Page 114 
attorneys who represent indigent defendants in capital cases, §15-12-21(d), Ala. Code 1975,[5] denied him the right to effective assistance of counsel.[6] He maintains that "[t]he meager compensation received was particularly debilitating in [his] case [because it] required unusually intensive investigation, travel out of state, and pretrial preparation." (Slaton's brief at p. 24.)
In Bui v. State, 717 So.2d 6 (Ala.Crim.App. 1997), rev'd on other grounds, Bui v. Haley, 321 F.3d 1304 (11th Cir. 2003), this Court addressed an identical issue, stating:
 "Alabama courts have consistently upheld § 15-12-21(d) against constitutional challenges. See Ex parte Smith, 698 So.2d 219 (Ala. 1997); Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); McNair v. State, 706 So.2d 828 (Ala.Cr.App. 1997); May v. State, 672 So.2d 1307 (Ala.Cr.App. 1993), writ quashed, 672 So.2d 1310 (Ala. 1995); Hallford
[v. State], 629 So.2d [6,] 11-12 [(Ala.Crim.App. 1992)]. In Ex parte Grayson, the Alabama Supreme Court rejected a claim that Alabama's method of compensating attorneys in capital cases denied the defendant the right to effective assistance of counsel, stating:
 "`These contentions are made on the premise that lawyers will not provide effective assistance unless paid a certain amount of money. But the legal profession requires its members to give their best effort in "advancing the `undivided interest of [their] client[s].'" Polk County v. Dodson, 454 U.S. 312, 318-19, 102 S.Ct. 445, 449-50, 70 L.Ed.2d 509 (1981). This Court, in Sparks v. Parker, 368 So.2d 528, 530 (Ala. 1979), quoted the New Jersey Supreme Court as follows:
 "`"We know of no data to support a claim that an assigned attorney fails or shirks in the least the full measure of an attorney's obligations to a client. Our own experience, both at the bar and on the bench, runs the other way. A lawyer needs no motivation beyond his sense of duty and pride. [State v. Rush, 46 N.J. 399, 405-07, 217 A.2d 441, 444-45 (1966).]"'
"479 So.2d at 79-80.
 "Thus, we reject the notion that Alabama's statutory scheme for compensating attorneys in capital cases, in and of itself, denies a defendant effective representation."
717 So.2d at 15.
In addition, Slaton alleged no facts in his petition and presented no evidence at the evidentiary hearing to support his allegation that the compensation scheme in § 15-12-21(d) caused his counsels' performance to fall outside "the wide range of professionally competent assistance." Strickland v. Washington,466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In fact, as the circuit court correctly noted in its order, at the evidentiary hearing both Evans and Barnett testified that the fact that their compensation *Page 115 
was limited did not affect their representation of Slaton.
Trial counsel were not ineffective based Alabama's statutory scheme at the time of Slaton's trial for compensating attorneys representing indigent capital defendants.
 B.
Slaton contends that trial counsel were ineffective because, he says, one of his counsel, David Evans, had a conflict of interest while representing him.
In its order, the circuit court addressed this allegation as follows:
 "Slaton contends that trial counsel were ineffective because of an alleged conflict of interest between David Evans and Jane Manglona, Slaton's mother. Slaton must first demonstrate that the actions of trial counsel were deficient. He initially contends that there was a conflict of interest because Evans represented Nathan's father in a child support dispute with his mother. During the hearing, Slaton's present counsel claimed to have proof that Evans represented Raford Slaton in a child support case against Jane Manglona during the course of Nathan Slaton's trial. While present counsel made this allegation, no evidence was offered to substantiate this claim. Moreover, when asked about this alleged conflict of interest, both Evans and Barnett testified that they had no memory of the alleged representation of Raford Slaton in what was apparently a very minor matter, if it occurred at all. Slaton has failed to offer any evidence that counsel's performance fell outside of the `wide range of reasonable professional assistance.' Strickland, 466 U.S. at 668, 104 S.Ct. 2052. Defense counsel did not, therefore, render deficient performance based on this unsubstantiated allegation.
 "Slaton also points to the fact that Manglona filed a Bar complaint against Evans for an alleged confrontation between the two. As noted during the evidentiary hearing, this complaint was based on a wholly spurious version of events, concocted by Manglona. Manglona and her then husband visited Mr. Evans's office after the crime and, at that time, he explained to them that he could not argue that there had been a struggle and the gun had accidentally fired because of the angle at which Mrs. Phillips was shot. During the course of this explanation, Mr. Evans used a pistol that he had in his desk drawer as a demonstrative aid in his explanation. Neither Jane Manglona, nor her husband, showed any concern at that time. It was only two years later, after she had been forced to come to Alabama, that Manglona filed the complaint against Judge Evans. The only evidence offered to the Court concerning this claim was the testimony of trial counsel at the Rule 32 hearing. Judge Evans was able to refute Manglona's story and noted that he was subsequently cleared of any wrongdoing. There was no validity to Manglona's charges against Evans and Slaton offered nothing at the evidentiary hearing to even suggest that this charge had any merit.
 "Finally, Slaton asserts that the manner in which his mother was brought from Texas to testify on his behalf amounted to ineffective assistance of counsel because it caused a rift between her and his attorneys. Slaton must first demonstrate that counsel's actions were deficient. To begin, it should be noted that Slaton did not call Manglona to testify at the evidentiary hearing in support of these claims. These claims are, therefore, nothing more than unsubstantiated assertions, insufficient to support his claim of deficient performance. Slaton, *Page 116 
who has the burden of proof in this proceeding, has proven nothing.
 "Trial counsel testified that they had contacted Jane Manglona about testifying in this case and that she had refused to come and really did not care what happened to Slaton. Based on this contact with her, trial counsel believed that the only way to get her to come to Alabama and testify on Slaton's behalf was to force her to do so. Defense counsel felt that, if they could have Slaton's mother make a plea for his life, it would have a powerful impact on the jury and might influence the jurors to vote for life without parole. Consequently, they had Manglona arrested and brought to Alabama. Based on the testimony of trial counsel, it is clear that they reasonably believed this was the only method available to have Mrs. Manglona appear on Slaton's behalf. Thus, Slaton has failed to demonstrate that trial counsels' performance fell outside `the wide range of reasonable professional assistance.' Strickland v. Washington, 466 U.S. at 668, 104 S.Ct. 2052. Trial counsel were not deficient in having Manglona taken into custody and brought to Alabama in an attempt to save their client's life.
 "Additionally, Slaton has failed to even attempt to establish the prejudice prong of the Strickland
standard. Slaton has not asserted how any of the above instances of allegedly deficient performance effected the trial, nor does the record support such a finding. As noted by defense counsel, Evans did not interact with Manglona after her arrival and it was Barnett who questioned her on the stand. During the evidentiary hearing, defense counsel testified that Mr. Evans's relationship with Manglona had no impact on her testimony, particularly in view of the fact that Mr. Barnett questioned her during the trial. The court notes that Manglona's testimony was favorable to Slaton and that there is no indication that it was adversely effected in any way. Slaton offered nothing to the contrary and has failed to even argue that, but for the above allegedly deficient conduct, the outcome of this trial would have been different. This claim is without merit and is, therefore, denied."
(C. 411-14.) (Footnotes and citations to record omitted.)
The circuit court's findings are supported by the record of the Rule 32 proceedings and the record from Slaton's direct appeal. As the court correctly pointed out, although Slaton's Rule 32 counsel alleged that his trial counsel had represented Slaton's father in a child-support action against Slaton's mother at the same time he was representing Slaton on the capital-murder charge, no evidence of that was presented at the evidentiary hearing. When specifically asked by the circuit court during the Rule 32 hearing whether there was evidence of defense counsel's representation of Slaton's father, Rule 32 counsel stated that she had a witness who could testify to that. However, that witness was never called to testify at the Rule 32 hearing. Moreover, both Evans and Barnett testified at the hearing that they could not recall whether Evans had represented Slaton's father in an action against Slaton's mother. At one point during his testimony, Evans testified that he may have represented Slaton's father "in may be a URESA case," but he stated that he had no "real recollection of that." (R. 19-20.)[7] As the circuit court correctly *Page 117 
noted, the burden of proof at a Rule 32 hearing is on the petitioner. Slaton failed to prove that Evans had a conflict of interest while representing him. Moreover, Slaton failed to prove that Evans's apparently adversarial relationship with Slaton's mother, e.g., the complaint filed against Evans by Slaton's mother with the bar and the way in which Slaton's mother was brought from Texas to testify, constituted deficient performance or that it prejudiced his defense.
Therefore, we agree with the circuit court that Slaton failed to prove that his trial counsel were ineffective in this regard.
 C.
Slaton contends that his trial counsel were ineffective for not applying for youthful-offender status.
In its order, the circuit court addressed this argument as follows:
 "During the hearing, the court noted for the record that Judge Johnson denied youthful offender status after Slaton refused to give up his right to a jury trial and to consent to the requisite investigation. Judge Evans stated that he had no memory of waiving youthful offender status. Barnett testified that they did not pursue youthful offender status because, based on their experience, they knew that it would not be granted. Moreover, the record reflects that, during Slaton's arraignment, defense counsel explained that they did not want Slaton subjected to the requisite examination because, in the event that he was not granted youthful offender status, he might have divulged information that could be damaging to his defense. Based on the court's experience as a judge in this area and at this time, defense counsel was correct in its belief that youthful offender status would not have been granted in this case, where an elderly woman was beaten, raped, and murdered, and were well advised to take the precaution of advising their client not to subject himself to the requisite examination. Defense counsel was not deficient for failing to pursue a course of action they correctly knew to be futile. Thus, Slaton has failed to demonstrate that trial counsels' performance fell outside `the wide range of reasonable professional assistance.' Strickland v. Washington, 466 U.S. at 668, 104 S.Ct. 2052.
 "Moreover, Slaton has failed to even allege, either in his Rule 32 Petition or his Memorandum of Law, that, had defense counsel requested youthful offender status, it would have been granted and thus, would have changed the outcome of the trial. Consequently, Slaton has failed to establish the prejudice prong of the Strickland standard. This claim is without merit."
(C. 410-11.) (Footnotes and citations to record omitted.) We agree with the circuit court and adopt its findings as our own. *Page 118 
Trial counsel were not ineffective for not applying for youthful-offender status for Slaton.
 D.
Slaton contends that his trial counsel were ineffective during the guilt phase of his trial for not objecting to conduct by the prosecutor that Slaton says constituted misconduct. Specifically, Slaton argues that the prosecutor violated a pretrial order prohibiting him from speaking with any of the State's witnesses about previous statements or testimony once the trial had begun.
Before trial, Slaton filed a motion to prohibit the prosecutor from speaking with any State's witness about any testimony given during the trial before that witness testified or any previous statements of the witness. The trial court granted the motion, except with respect to expert witnesses. The record reflects that Evelyn Lindsay was the medical technician who took two vials of blood from Slaton after his arrest. She testified that she put lavender-colored tops on the vials of Slaton's blood. After she was excused, the State then called Rodger Morrison, a serologist with the Alabama Department of Forensic Sciences, to testify. Morrison testified that he tested vials of blood that had been labeled as coming from Slaton and that he determined that Slaton's blood-type matched the semen found in the victim's vagina. According to Morrison, the vials of blood taken from Slaton had red tops.
Both Lindsay and Morrison testified on Friday. Following Morrison's testimony, the State called two more witnesses, and the trial was then recessed for the weekend. On Monday, the State recalled Lindsay. On direct examination, Lindsay testified that she recalled her previous testimony that the vials of blood taken from Slaton had lavender tops on them. She stated, however, that her previous testimony was incorrect and that she now recalled that the vials actually had red tops on them. According to Lindsay, ordinarily she would have used lavender tops, but on this occasion, she had used red tops because she had been instructed to do so. On cross-examination, the following then occurred:
 "[Slaton's counsel]: Ms. Lindsay, you testified that the reason you used the lavender tubes was because of the anticoagulate EDTA?[8]
"[Lindsay]: Right.
 "[Slaton's counsel]: That was the reason you selected that tube?
"[Lindsay]: Right.
 "[Slaton's counsel]: And now that's not your testimony? "[Lindsay]: Right.
 "[Slaton's counsel]: It's different than the testimony you gave to this court on Friday?
"[Lindsay]: Right.
 "[Slaton's counsel]: Did you have some conversation with either [of the prosecutors] since you testified on Friday?
 "[Lindsay]: Yes. They said that I would be called back in.
 "[Slaton's counsel]: And was the discussion of whether or not the stoppers were red or lavender discussed at that time?
"[Lindsay]: Yes. *Page 119 
 "[Slaton's counsel]: Were you told by one of them that your testimony was incorrect on the color?
 "[Lindsay]: I was told that there needed to be some clarification on it.
". . . .
 "[Slaton's counsel]: If they hadn't contacted you, would it have been a significant point to you? Would you have called them back?
"[Lindsay]: Had I recalled, yes.
 "[Slaton's counsel]: After you talked to them, you recalled it was a different color?
"[Lindsay]: Right.
 "[Slaton's counsel]: But not before then? "[Lindsay]: Right."
(Record on Direct Appeal, R. 1461-62.) Before Lindsay was recalled, Slaton's counsel objected to her being recalled on several grounds; those objections were overruled. After Lindsay testified, Slaton's counsel moved to strike Lindsay's testimony on several grounds; the motion was denied. None of Slaton's objections at trial were based on the pretrial motion.
However, Slaton now contends that his trial counsel should also have objected to Lindsay's being recalled and to her testimony after she was recalled on the ground that the prosecutor violated the trial court's pretrial order granting Slaton's motion to prohibit the prosecutor from speaking to any of its witnesses about testimony received during the trial. According to Slaton, the prosecutor improperly spoke with Lindsay about her previous testimony and persuaded her to change her testimony. We disagree.
Lindsay testified that the prosecutor contacted her and told her that he needed to recall her to clarify her testimony as to the color of the top on the vials of Slaton's blood. However, there is no indication in the record of Slaton's trial and Slaton presented no evidence at the Rule 32 hearing, that the prosecutor and Lindsay discussed what her previous testimony had been, much less that the prosecutor persuaded Lindsay to change her testimony as to the color of the tops on the vials of blood containing Slaton's blood. There was no prosecutorial misconduct in this regard.
Moreover, as the circuit court correctly noted in its order, Slaton failed to demonstrate that had counsel objected to Lindsay's testimony on this ground at trial that the outcome of his trial would have been different. He presented no evidence at the Rule 32 hearing with respect to this claim and made nothing more than a bare allegation in his petition. "The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief." Rule 32.3, Ala.R.Crim.P. Slaton failed to satisfy that burden with respect to this ground of ineffective assistance of counsel.
 E.
Slaton contends that his trial counsel were ineffective during the guilt phase of his trial for not presenting adequate mental-health evidence to support his plea of not guilty by reason of mental disease or defect. He makes several arguments in this respect, each of which the circuit court thoroughly and properly addressed in its order:
 "Slaton contends that trial counsel were ineffective for relying on the testimony of Dr. Jack Bentley at trial in support of the defense that Slaton was suffering from a mental illness. Slaton contends that Dr. Bentley was not allowed sufficient time to diagnose his illness and that Bentley, unlike Dr. Brad Fisher at the evidentiary hearing, failed *Page 120 
to testify concerning Slaton's troubled past and the connection between it and his criminal behavior. Contrary to Slaton's contention, defense counsel called five mental health witnesses, in addition to Bentley, in support of their theory of mental illness. Dr. Bentley diagnosed Slaton with an organic brain syndrome explosive type and testified that this was consistent with both Intermittent Explosive Disorder (IED) and Temporal Lobe Epilepsy. Dr. Bernard Musselman testified that Slaton suffered from IED and stated that Slaton couldn't control himself when angry and that he was unaware that what he was doing was wrong. Dr. Donald Sawyer testified that Slaton suffered from IED and that he had no control during one of these episodes of uncontrollable anger. Holly Myers, a psychiatric social work assistant from New York, testified concerning Slaton's troubled past and history of behavior problems. Alan James Murray, a rehabilitation counselor at the time of Slaton's hospitalization in New York, testified that Slaton suffered from IED and Temporal Lobe Epilepsy. Dr. Huessy testified that Slaton suffered from IED and Temporal Lobe Epilepsy and that he had no control over his actions during an episode and could not distinguish between right and wrong. In addition, each of these experts testified concerning Slaton's past and how it effected the diagnosis of his illness. Dr. Bentley's testimony was based, in part, on the testing by these and other experts from New York, and was very much in agreement with their testimony.
 "Moreover, it should be noted that the five mental health professionals from New York evaluated and diagnosed Slaton as mentally ill independent of the trial.[9] When they made their findings, they had not been retained by one side in an adversarial proceeding and, therefore, had no readily discernable bias in favor of either Slaton or the State. Consequently, these five were arguably more credible than the mental health experts Slaton retained for the Rule 32 hearing. In fact, trial counsel stated that they wanted these experts to testify, in part, because of this perception of independence. There was no deficient performance as to this issue.
 "Furthermore, there was no proof of prejudice. During the evidentiary hearing, Dr. Fisher stated that he agreed with the testimony offered by the defense mental health experts and, when asked if there was any part of this testimony he felt was incorrect, he stated that he could not think of any particular point of disagreement. Moreover, Fisher failed to offer any testimony concerning Slaton's past that had not already been presented. Slaton fails to point to any specific testimony to support his contention to the contrary. During the evidentiary hearing, Dr. Fisher characterized his diagnosis as `it is what it is' and, while agreeing with the previous diagnoses of Intermittent Explosive Disorder and Temporal Lobe Epilepsy, declined to specifically label Slaton's alleged malady. Dr. Fisher stated that he did not know why Slaton remembers some information and not other [information] and that, because they did not excuse the crime or relieve Slaton's liability for it, he was not certain what his findings had to do with the crime. Moreover, Dr. Fisher admitted that he elected not to review the facts of the crime because he had `found that [he] caused more damage than good' when *Page 121 
he did so. When asked by Slaton's present counsel to explain why Slaton has not `exploded' while in prison, Dr. Fisher stated that Slaton's problem was resolving itself, but that he did not know precisely `how the wound healed.' When the Court asked him to clarify these remarks, Dr. Fisher stated that apparently Slaton's condition is self-curable because it has not occurred since Slaton was incarcerated in 1987. The court had ample opportunity to observe Dr. Fisher and evaluate his credibility and while the court finds Dr. Fisher's testimony to be incredible and rejects it as such, it is also clear that Dr. Fisher could have added nothing to the original trial proceedings except to have been the seventh mental health expert to testify on behalf of Nathan Slaton. Slaton has failed to establish that trial counsel were deficient in calling Dr. Bentley to the stand. See Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995).
 "Although it is not necessary for the court to address the second prong of the Strickland
analysis, the court notes that Slaton has failed to attempt to demonstrate that, had counsel not called Dr. Bentley and called someone like Dr. Fisher instead, the outcome of his trial would have been different. This claim is without merit and is, therefore, denied.
". . . .
 "Slaton contends that trial counsel were ineffective for failing to call Dr. Mary Traynor as a witness. Slaton must first establish that trial counsel's decision not to call Dr. Traynor as a witness fell outside of the `wide range of reasonable professional assistance.' Strickland, 466 U.S. at 668, 104 S.Ct. 2052. He failed to do so. During the evidentiary hearing, trial counsel stated that they had not called Traynor because she had a bad reputation in the community and, because this is a small county, they felt certain that the jurors would be aware of this reputation and that it would have undermined her credibility with the jury. Slaton offered nothing at the evidentiary hearing to demonstrate that this belief was erroneous. . . . Trial counsel was, therefore, not deficient in making the strategic decision not to undermine its case by calling Traynor as a witness at trial. See Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995) (holding that the decision of which witness to call `is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.').
 "Although it is not necessary to address the second prong of the Strickland standard, the court further finds that Slaton has failed to demonstrate that, had counsel called Dr. Traynor to testify, the outcome of his trial could have been different. . . . Traynor's testimony would have served to undermine the mental health testimony that Slaton suffered from Temporal Lobe Epilepsy. She specifically stated that she disagreed with this diagnosis and also stated that Slaton could be faking. While she agreed that Slaton suffered from IED, Traynor testified that she disagreed with the diagnostic criteria for IED as set forth in the DSM-III-R, apparently refusing to recognize its authority. Moreover, Dr. Traynor testified that she believed that the victim had innocently provoked Slaton who lost control and killed her. She later stated that this provocation was the victim's alleged desire to have sex with him and that she did not disbelieve Slaton's allegations that Mrs. Phillips raped him at gunpoint. The court finds this testimony to be incredible, especially in view of the fact that Slaton no longer contends that Mrs. Phillips raped him, and that it would have been inflammatory had it *Page 122 
been presented to the jury. In fact, in the opinion of the court, it appears that Dr. Traynor would have done nothing more than needlessly hurt the credibility of Slaton's defense had she been called to testify. This claim is without merit and is denied.
". . . .
 "Slaton contends that trial counsel were ineffective for failing to have him subjected to a `whole battery of tests' to determine his mental health. This claim was dismissed for failure to comply with the full disclosure requirement of Rule 32.6(b), of the Alabama Rules of Criminal Procedure, with leave to amend within 30 days of the dismissal. . . . Slaton failed to amend his petition and, therefore, this claim was dismissed.
 "In the alternative, the court finds this claim to be without merit. Slaton offered nothing during the Rule 32 Hearing in support of this claim and has referred to nothing new in his Memorandum of Law. The results of all the prior psychological testing were admitted at trial and Slaton has not even argued how a new EEG would have effected the outcome of the trial. Significantly, Dr. Fisher and Dr. Traynor, the two mental health experts Slaton presented at the evidentiary hearing, both relied on this prior testing to form their opinions and neither testified that additional testing was desirable, much less necessary. Slaton failed to demonstrate that counsel was deficient and has only asserted that, had additional tests been done, the outcome of the trial would have been different. Mere assertions are insufficient to establish either prong of the Strickland standard. This claim is without merit."
(C. 414-20.) (Footnotes and citations to record omitted.)
These findings are supported by the record of the Rule 32 proceedings and the record from Slaton's direct appeal, and we adopt them as our own. Trial counsel were not ineffective in this regard.
 F.
Slaton contends that his trial counsel were ineffective during the guilt phase of his trial for not requesting a jury instruction on felony murder as a lesser-included offense of capital murder. Specifically, he argues:
 "The defense case rested upon a mental health defense. Essential to that defense is a denial of the specific intent to kill the victim. Petitioner did not deny responsibility for the death of the victim or that he had sexual intercourse with her. Defense counsel acknowledged this during opening statement. Nevertheless, trial counsel failed to insist upon a felony-murder instruction that would have given effect to the evidence of [Slaton's] mental state at the time of the crime."
(Slaton's brief at p. 17.)
Slaton's claim appears to be based on the doctrine of "diminished capacity."
 "The diminished-capacity doctrine recognizes that although an accused was not suffering from a mental disease or defect when the offense was committed sufficient to exonerate him of all criminal responsibility, his mental capacity may have been diminished by intoxication, trauma, or mental disease so that he did not possess the specific mental state or intent essential to the particular offense charged. A defendant claiming diminished capacity concedes his responsibility for the act but claims that, in light of his abnormal mental condition, he is less culpable.' *Page 123 
 "State v. Thompson, 695 S.W.2d 154[, 157-58] (Mo.App. 1985) (quoting State v. Correra, 430 A.2d 1251, 1253 (R.I. 1981)). Alabama has expressly rejected the diminished capacity doctrine. Neelley v. State, 494 So.2d 669 (Ala.Cr.App. 1985).
 "The rule applied in this jurisdiction is sometimes referred to as the `all-or-nothing' approach. Comment, Diminished Capacity — Recent Decisions and an Analytical Approach, 30 Vand.L.Rev. 213 (1977). That is, under our statutes a defendant is either sane or he is not. Thus, a charge on a lesser included offense predicated on mental capacity should not be given when the evidence suggests that the defendant has a diminished mental capacity, but is not insane as defined in § 13A-3-1, Code of Alabama 1975.
 "If the jury in the present case had found that appellant Hill was suffering from a mental disease or defect at the time she shot the decedent and that that disease or defect produced the act, then she could be found not guilty by reason of mental defect. In that event, a charge on the lesser included offense would not be needed. If, on the other hand, she was found to be sane at the time of the murder, a lesser included offense charge . . . should be given only if the facts of the particular case — facts unrelated to any diminished mental capacity — would warrant the giving of such a charge."
Hill v. State, 507 So.2d 554, 556-57 (Ala.Crim.App. 1986) (emphasis added).
Slaton does not argue that the facts of his case, unrelated to his defense of mental disease or defect, supported a charge on felony murder;[10] his sole argument is that his defense of mental disease or defect supported a charge on felony murder and that, therefore, his counsel were ineffective for not requesting such a charge. However, because diminished capacity is not recognized as a defense in Alabama, Slaton was not entitled to an instruction on felony murder based on the evidence he presented in support of his defense of mental disease or defect, and his counsel were, therefore, not ineffective for not requesting such an instruction on that basis.
 G.
Slaton contends that his trial counsel were ineffective during the penalty phase of his trial for not adequately preparing and presenting the testimony of Walter L. Colbert, sheriff of Marshall County. Specifically, Slaton argues that counsel failed to adequately prepare the witness before his testimony, which resulted in Sheriff Colbert's testifying that, while in jail awaiting trial, Slaton had been in two fights and had attempted to escape once.
In its order, the circuit court addressed this argument as follows:
 "Slaton contends that `[t]rial counsel presented one witness during the sentencing phase, Marshall County Sheriff, Walter L. Colbert, who testified that Nathan had been involved in two fights and had attempted to escape from custody while in jail awaiting trial.' Slaton then contends that trial counsel did not prepare this witness to testify, no strategic decision was involved, and trial counsel `intended to call Sheriff Colbert no matter what his testimony was.' Initially, Sheriff Colbert was actually one of four witnesses called by the defense during the penalty phase: Raford Slaton, *Page 124 
Sheriff Walter L. Colbert, Karen Slaton, and Jane Manglona. Sheriff Colbert testified that, although Slaton had been in two fights and one attempted escape, they had not had `a real serious problem' with him and that Slaton had been a good inmate. In fact, Sheriff Colbert minimized the impact of his testimony concerning the fights by stating that neither was severe and neither resulted in the need for medical attention. He also stated that such incidents are common among the prisoners.
 "David Evans stated that the community thought favorably of the sheriff and that he assumed that some member of the defense team would have known what Sheriff Colbert's testimony would be before he took the stand. George Barnett actually questioned Colbert at the trial. At the hearing, Barnett stated that he generally knew that the sheriff would testify that Slaton had generally been a good prisoner who had been in a couple of scrapes, but had been fine in general and not a big trouble-maker. Defense counsel wanted the sheriff to testify because he was so well liked that `if he could say anything nice about Nathan, it couldn't hurt anything.' Specifically, defense counsel thought that Colbert could `humanize' Slaton and they `felt like [if] the jury believed that the sheriff thought he was an OK kind of guy even though he was a prisoner, the jury — that some of that might be transferred to the jury.'
 "From the nature of this testimony and the remarks of counsel during the Rule 32 hearing, it is clear that defense counsel knew how Sheriff Colbert would testify and that they wanted to call him to the stand for a valid, strategic purpose. See Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995) (holding that the decision of which witness to call `is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.'). Specifically, defense counsel wanted Colbert's testimony to `humanize' Slaton and cast him in the best possible light before the jury during the penalty phase. Colbert's testimony clearly achieved this goal in that the sheriff's testimony characterized Slaton as a good inmate that had not gotten in any trouble that was out of the ordinary for inmates. Defense counsel were not deficient in calling Sheriff Colbert to testify. Moreover, Slaton has failed to demonstrate that, had counsel `prepared' this witness to testify or had chosen not to call him altogether, the outcome of his trial would have been different. This claim is without merit and is, therefore, denied."
(C. 427-29.) (Footnotes and citations to record omitted.)
We agree with the circuit court. Trial counsel's decision to call Sheriff Colbert was clearly a strategic decision. "The decision [to call or] not to call a particular witness is usually a tactical decision not constituting ineffective assistance of counsel." Oliver v. State, 435 So.2d 207, 208-09 (Ala.Crim.App. 1983). "[I]t is not our function to second-guess the strategic decisions made by counsel." Smith v. State, 756 So.2d 892, 910
(Ala.Crim.App. 1997) (opinion on return to remand), aff'd,756 So.2d 957 (Ala. 2000). Such strategic decisions "are virtually unassailable." McGahee v. State, 885 So.2d at 222.
Trial counsel were not ineffective in this regard.
 H.
Slaton contends that his trial counsel were ineffective during the penalty phase of his trial for not requesting a jury instruction on the statutory mitigating circumstance *Page 125 
of no significant history of prior criminal activity. Specifically, he maintains that "[c]ounsel's failure to insist on the consideration of the statutory mitigating circumstance of no significant history of prior criminal activity deprived [him] of his constitutional right to have that evidence fully considered and weighed against any aggravating circumstances." (Slaton's brief at p. 28.)
The record from Slaton's direct appeal reflects that although Slaton's counsel did not request a jury instruction on the statutory mitigating circumstance of no significant history of prior criminal activity, the trial court nevertheless charged the jury that it could consider that as a mitigating circumstance. (Record on Direct Appeal, R. 2171.) Because the trial court charged the jury on the statutory mitigating circumstance of no significant history of prior criminal activity, there was no need for counsel to make a formal request for the charge. Therefore, counsel were not ineffective in this regard.
 I.
Slaton contends that his trial counsel were ineffective at the sentencing hearing before the court because, he says, they "fail[ed] to present a strategy to save [his] life." (Slaton's brief at p. 29.) Specifically, Slaton argues that counsel waived argument at the sentencing hearing before the court and failed to present "any additional evidence to the trial court," thereby "conced[ing] death as the punishment." (Slaton's brief at p. 29.)
In its order, the circuit court found that Slaton failed to plead sufficient facts pursuant to Rule 32.3 and Rule 32.6(b) to support this argument, and we agree. In addition, as this Court noted in Boyd v. State, 746 So.2d 364 (Ala.Crim.App. 1999), in addressing an identical issue:
 "[Section] 13A-5-47, Ala. Code 1975, governs the determination of sentence by the trial court. Section 13A-5-47, Ala. Code 1975, does not provide for the presentation of additional mitigation evidence at sentencing by the trial court. Therefore, trial counsel did not err in failing to do so."
746 So.2d at 398. Trial counsel were not ineffective in this regard.
 J.
Slaton also contends that his trial counsel were ineffective for not objecting to several alleged defects during his trial. Specifically, he argues that counsel were ineffective for not objecting to the following:
 1. The admission during the guilt phase of his trial of only a portion of his statement to police and the trial court's instructing the jury that his whole statement was not admitted because portions of it were inadmissible;
 2. The admission during the guilt phase of his trial of evidence of his juvenile adjudications;
 3. The prosecutor's alleged argument during the penalty phase of the trial that the jury could not consider mercy in making its sentencing recommendation.
On direct appeal, this Court reviewed the entire record for plain error and found none. See Slaton, 680 So.2d at 908. "A finding of no plain error precludes a finding of prejudice under the Strickland test." Flowers v. State, 799 So.2d 966, 994
(Ala.Crim.App. 1999) (opinion on return to remand). Because this Court has already determined that no plain error occurred during the proceedings, Slaton could not be prejudiced by counsel's decision not to object to the alleged defects listed above. Therefore, trial counsel were not ineffective in this regard. See, e.g., Williams v. *Page 126 State, 783 So.2d 108, 133-35 (Ala.Crim.App. 2000).
 K.
Finally, we note that Slaton does not pursue on appeal several of the grounds he raised in his petition in support of his ineffective-assistance-of-trial-counsel claim and that the circuit court addressed in its order. Those grounds are:
 1. That his trial counsel were ineffective for not adequately questioning prospective jurors during voir dire examination and for not challenging for cause a prospective juror who stated that she knew the victim's daughter.
 2. That his trial counsel were ineffective for not objecting to the trial court's granting of one of the State's challenges for cause.
 3. That his trial counsel were ineffective for not hiring an expert to independently examine the forensic pathology evidence and for not adequately cross-examining the forensic pathologist.
 4. That his trial counsel were ineffective for not adequately investigating and cross-examining State witnesses.
 5. That his trial counsel were ineffective for making certain statements during closing arguments at the guilt phase of his trial.
 6. That his trial counsel were ineffective for not "seek[ing] appropriate expert assistance for the pretrial, trial, and sentencing proceedings" including "forensic experts and various mental health experts." (C.Supp.62.)
 7. That his trial counsel were ineffective for not adequately challenging the admissibility of Slaton's statement to police.
 8. That his trial counsel were ineffective for not hiring an expert to analyze the tape recording of Slaton's statement to police.
 9. That his trial counsel were ineffective for not requesting additional funds for mental-health experts.
 10. That his trial counsel were ineffective for not adequately investigating the case and for not presenting an adequate defense.
 11. That his trial counsel were ineffective for not presenting evidence of Slaton's mental state at the time of the crime in order to show that he did not have the intent to kill.
 12. That his trial counsel were ineffective for not adequately pursuing the defense that no DNA or fingerprint evidence linked Slaton to the crime and that the blood evidence did nothing more than include Slaton as one of thousands of people who could have committed the crime.
 13. That his trial counsel were ineffective for "pursuing an incoherent theory of defense." (C.Supp.66.)
 14. That his trial counsel were ineffective for giving "an inadequate opening statement." (C.Supp.66.)
 15. That his trial counsel were ineffective for not adequately investigating the rape aspect of the capital-murder charge and for not requesting DNA testing to prove that he did not commit rape.
 16. That his trial counsel were ineffective for not objecting to the trial court's decision to postpone the evidentiary hearing on his motion to suppress his statement to police until the trial began.
 17. That his trial counsel were ineffective for not adequately questioning *Page 127 
prospective jurors during voir dire and for not requesting that more detailed questionnaires be used.
 18. That his trial counsel were ineffective for not conducting an adequate investigation before sentencing and for not presenting more witnesses on his behalf during sentencing.
 19. That his trial counsel were ineffective for not obtaining expert assistance for mitigation at sentencing.
 20. That his trial counsel were ineffective for not adequately preparing those witnesses that were called in his defense at sentencing.
 21. That his trial counsel were ineffective for not emphasizing during closing arguments at sentencing that a sentence of life without the possibility of parole meant that he would never get out of prison and for not requesting a jury instruction to that effect.
 22. That his trial counsel were ineffective for not objecting to the admission of the presentence report.
 23. That his trial counsel were ineffective for not objecting to the trial court's use of his juvenile record to negate the statutory mitigating circumstance that he had no significant history of prior criminal activity.[11]
We will not review these grounds because, as noted previously," `[a]llegations . . . not expressly argued on . . . appeal . . . are deemed by us to be abandoned.'" Burks v. State,600 So.2d 374, 380 (Ala.Crim.App. 1991), quoting United States v.Burroughs, 650 F.2d 595, 598 (5th Cir. 1981).
Based on the foregoing, the judgment of the circuit court denying Slaton's Rule 32 petition is affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, and WISE, JJ., concur.
[1] Slaton was originally charged as a juvenile. The juvenile court transferred Slaton to circuit court for prosecution as an adult, and this Court affirmed the juvenile court's transfer order. See Slaton v. State, 555 So.2d 814 (Ala.Crim.App. 1989).
[2] Slaton argued that the district attorney had two separate and distinct conflicts of interest, and he presented the two alleged conflicts as two separate claims in his petition. We have combined the two claims into one because neither were raised at trial or on appeal.
[3] At the time of the Rule 32 hearing, Evans was a district judge in Marshall County.
[4] Bryant was the neighbor who saw Slaton enter the victim's house on the day of the murder.
[5] Section 15-12-21 was amended in 1999 to remove the cap on the total fee an attorney representing an indigent defendant could recover.
[6] As part of this argument, Slaton also maintains that Alabama's "limitations on compensation violate the separation of powers doctrine, constitute a taking of property without just compensation, . . . and violate the equal protection clause." (Slaton's brief at pp. 23-24; C.Supp. 52.) These arguments are procedurally barred by Rule 32.2(a)(2) and (a)(5) because they were raised and addressed at trial, (Record on Direct Appeal, R. 2256), and could have been, but were not, raised and addressed on direct appeal.
[7] In his reply brief, Slaton maintains that the circuit court's finding that Evans and Barnett had no recollection of Evans's alleged representation of Slaton's father is a misstatement of the evidence presented at the Rule 32 hearing; he then cites us to several pages in the record. We have thoroughly reviewed the testimony of both Evans and Barnett, including the pages cited by Slaton. Both testified that they had no independent recollection of Evans representing Slaton's father. On those pages cited by Slaton, however, both also testified that if Slaton's allegation was true, they did not believe Evans's representation of Slaton's father constituted a conflict of interest. It is clear from a review of the entire testimony at the hearing that when Evans and Barnett were testifying about the alleged conflict, they were assuming that Evans had represented Slaton's father; they were not stating that it had actually happened or that they recalled it happening, as Slaton alleges in his reply brief.
[8] In her original testimony, Lindsay stated that she had used lavender tops on the vials of blood because the vials with lavender tops contained anticoagulants to prevent the blood from clotting which, she said, was important if the blood is going to be typed as it was in this case.
[9] The record from Slaton's direct appeal reflects that he had been hospitalized in a psychiatric hospital in New York in 1985, two years before Modenia Phillips was murdered.
[10] Because Slaton makes no argument in this regard, we do not address whether his counsel were ineffective for not requesting a felony-murder instruction based on facts unrelated to Slaton's defense of mental disease or defect.
[11] We note that in the initial opinion on appeal, this Court held that the trial court had erred in using Slaton's juvenile record to negate the statutory mitigating circumstance of no significant history of prior criminal activity; this Court remanded the case, in part, for the trial court to find that mitigating circumstance to exist and to resentence Slaton with consideration of that mitigating circumstance. See Slaton v.State, 680 So.2d at 879.